UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:13-CV-00163-TBR

REGINA ANN FULCHER                                                                                      Plaintiff,

v.

UNITED STATES OF AMERICA                                                                      Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon a number of motions filed in preparation for a bench trial to be held on December 30, 2014. The issues before the Court include Plaintiff Regina Fulcher's objections to the Government's list of trial witnesses and exhibits, (Docket No. 14), to which the Government has responded, (Docket No. 17). The Government also filed objections to Fulcher's proposed exhibits list, (Docket No. 16), to which Fulcher responded, (Docket No. 22). Additionally, in Fulcher's Pretrial Memorandum, she raised issues concerning the collateral source rule. (Docket No. 11.) The Government responded in a brief of its own, (Docket No. 19), to which Fulcher replied, (Docket No. 21), and the Government filed an additional brief, (Docket No. 24). Fully briefed, these matters stand ripe for adjudication.[1] The Court will address each in turn.

### Factual Background

In her Complaint and supporting memoranda, Fulcher alleges that on the rainy afternoon of January 25, 2012, she traveled to the United States Post Office located at 225 West Broadway, Mayfield, Kentucky ("the Post Office") to check her mail. She entered through the wheelchair accessible door and stepped onto a floor mat saturated with rain, causing her to slide, lose her balance, and fall forward onto the wet floor, striking a display shelf before ultimately landing on her right side. Fulcher did not report

---

[1] Also pending is the Government's Motion in Limine to exclude the opinion testimony of Dr. Adams, (Docket No. 23), filed December 10, 2014. Because no response has yet been filed as of the time of this Order, the Court will not address this Motion herein.

1

the fall that day, although her husband briefly spoke with a USPS employee after the incident. However, she returned to the Post Office the following day and reported her fall and the resultant pain in her right shoulder and right side to a customer service supervisor.

On January 27, 2012, Fulcher complained to her internist, Dr. Patrick Finney, of pain in both shoulders, in her chest and ribs, and down the right side of her body.[2] She saw Dr. Finney again on March 7, 2012, where she complained of pain and swelling in her right foot. Upon Dr. Finney's referral, a three-phase bone imaging diagnostic study revealed radiotracer activity in the right ankle. During subsequent appointments on June 4, 2012, and September 5, 2012, Fulcher was referred for x-rays that demonstrated a nondisplaced medial malleolus fracture—that is, a broken ankle—with overlying soft tissue edema.[3] Dr. Finney then referred Fulcher to Dr. William R. Adams of the Orthopaedic Institute of Western Kentucky. On October 8, 2012, Fulcher complained to Dr. Adams of pain in her right foot; agreeing with the previous diagnosis of nondisplaced medial malleolus fracture, he prescribed a pneumatic walking boot to immobilize the ankle.

An MRI performed in December revealed a more significant injury: Dr. Harold Halfhill diagnosed a nonunited fracture involving the medial malleolus, but observed minimum displacement rather than the nondisplacement previously noted. On January 11, 2013, Fulcher returned to the Orthopaedic Institute complaining of ongoing ankle pain despite the walking boot. In light of her persistent pain, coupled with numbness and tingling in her toes, Dr. Adams instructed Fulcher to forego wearing the boot and to instead begin physical therapy. He also explained that her treatment options

---

[2] In its Proposed Findings of Fact and Conclusions of Law, the Government references Fulcher's treatment by Nurse Practitioner Amanda Hale on the same date. Ms. Hale's deposition clarifies that she was employed in Dr. Finney's internal medicine practice. The Court assumes that Ms. Hale and Dr. Finney coordinated Fulcher's care in partnership. Moreover, the Government notes that Fulcher's medical record from this date was devoid of complaints of foot pain and that at deposition, Ms. Hale stated that she would have ordered a radiographic study had Fulcher complained of such pain.

[3] The Government contests Fulcher's characterization of the June appointment, contending instead that no record of foot pain exists from this visit and that Fulcher was treated only for itching associated with a foot rash.

included either long-term ankle bracing or surgery to excise the fractured ligament and reattach the deltoid ligament.

However, Fulcher was financially unable to pay for physical therapy. Instead, she returned to Dr. Finney, who prescribed Neurontin for severe foot pain on May 3, 2013. On December 4, 2013, Dr. Marissa Stewart-Jaynes of Mercy Primary Care-Paducah also referred Fulcher to physical therapy. She eventually began a physical therapy regimen on January 7, 2014, which lasted until March 5, 2014. Although she reports improved strength, she alleges that her ankle pain persists.

According to Fulcher, X-rays taken prior to her fall at the Post Office did not reveal a fracture of either her right ankle or her right foot. The Government disagrees, arguing that Hale's records prior to the January 2012 indicate swelling and problems in her right foot predating her fall at the Post Office. The Government further notes that an April 2012 medical report regarding Fulcher's bone scan does not reference a specific event relative to her foot swelling and pain. Instead, the scan demonstrated possible arthritic changes in the right ankle. The Government also contends that the September 2012 x-ray demonstrated an "[i]ndeterminate age medial malleolus fracture. This appears to be chronic though there is overlying soft tissue edema." Finally, the Government points to the testimony of Nurse Practitioner Amanda Hale, who testified that Fulcher's ongoing diabetes and osteoporosis left her vulnerable to chronic foot injuries, even without a traumatic event.

Fulcher brings this lawsuit pursuant to the Federal Tort Claims Act. *See* 28 U.S.C. §2671, *et seq*. She alleges that the Government, through employees of the United States Postal Service ("USPS"), failed to exercise ordinary care by neglecting to replace the wet floor mat with a dry one. She also alleges that USPS employees negligently failed to comply with agency regulations requiring the use of signs to caution customers of a wet floor. (Docket No. 1, ¶¶ 7-12.) She alleges that she has exhausted her administrative remedies, having submitted a claim for $47,417.02—including $12,385.46 in medical damages—to the USPS on December 10, 2012, and filing a timely request for reconsideration upon its

3

rejection, also denied. Upon the second denial, she filed the instant complaint within the six-month period set forth by the statute.

## Analysis

### I. Fulcher's Objections to the Government's Trial Witness and Exhibit Lists

The Court now turns to the substance of the parties' pretrial motions, beginning with Fulcher's objections to the Government's list of trial witnesses and exhibits. (Docket No. 14.) Fulcher first argues that although the Government indicated in its Rule 26(a)(1) disclosures that it intended to call a representative of Cintas National Rental Program ("Cintas"), it did so in only the most general terms and failed to provide the name or contact information of any individual Cintas employees. Without this information, Fulcher contends that she was unable to contact and perhaps depose the unknown Cintas employee at issue.

To be sure, the Government fell short of its Rule 26 obligations, which require a party to provide the name, address, and telephone number of each witness that it may call at trial. *See* Fed. R. Civ. P. Rule 26(a)(3)(A)(i). However, the Government no longer plans to call a Cintas employee to testify. (*See* Docket No. 17.) Without the possibility of such testimony, Fulcher's objection to the incomplete disclosure is rendered moot.

Fulcher next objects to the Government's Exhibit No. 14, entitled "Weather Data for January 25, 2012." (*See* Docket No. 8, Defendant's Exhibit and Witness Lists. This exhibit describes weather conditions in the cities of Murray and Paducah, neither of which was the location of the alleged accident. The Government explains that it relies upon official weather data associated with the Murray and Paducah airports only because no such official data exists for Mayfield. Should either party acquire official weather data for Mayfield, the Court welcomes its introduction and assumes that neither party would object. Barring such information, however, the Court will permit the Murray and Paducah reports and will afford them the weight it deems appropriate.

Finally, Fulcher contends that the Government should not be permitted to introduce an example of the "Caritas floor mat." Although Fulcher requested a sample of the mat that was used on the date of the accident, the Government indicated that it was uncertain if the rugs used presently are similar to those used at the time of the alleged accident in 2012. The Court understands that Cintas replaced the Post Office's floor mats every two weeks; therefore, the mat to be presented at trial is not necessarily representative of the one used two years ago. The Court will address this issue at trial. The Court is uncertain as to whether the Government can present proper foundation as to the introduction of the evidence. Because this is a bench trial, however, this issue can easily be resolved at trial.

## II.   The Government's objections to Fulcher's proposed trial exhibits

The Court next considers the Government's objections to certain of Fulcher's proposed trial exhibits, each concerning medical evidence of her purported injuries. (Docket No. 16.) The Government contends that Fulcher's foot problems fail to appear in her medical records until months after the alleged accident. Its first objection lies with Fulcher's timeline of her medical care; although this timeline is not in the record, it is referenced in Fulcher's proposed list of trial exhibits. (*See* Docket No. 12, No. 5.) This exhibit apparently consists of a chart with four columns specifying the date, medical provider, complaint/treatment, and exhibit numbers related to the appointment at issue. Medical record exhibits are appended to the timeline; Fulcher contends that these records verify the summaries provided in the timeline. (Docket No. 22.) However, the Government argues that this timeline misrepresents the medical record and relevant testimony and asks the Court to exclude it.[4]

---

[4] By way of example, the Government says that the timeline suggests that on March 7, 2012, Dr. Finney's office recorded: "Due to right foot pain & swelling, referred for bone imaging." Fincher's medical record, however, contains no such notation. Moreover, the Government points to Nurse Practitioner Amanda Hale's testimony that she neither observed nor noted foot swelling or pain during this visit. (*See* Docket No. 15, Hale Dep., at 39: 7-11; Docket No. 16-1, Record of March 7, 2012, Appointment.) Fulcher responds that the three-phase bone imagine report of Fulcher's right foot, attached as Exhibit 5-e, provides this diagnosis: indeed, this document lists the ordering diagnosis from Dr. Finney's office as "RT FOOT PAIN, SWELLNG." (*See* Docket No. 22-1, Report of Dr. Park.)

5

The Government also objects to the introduction of Fulcher's Exhibit No. 6, "Objective Diagnostic Evidence" exhibit. (*See* Docket No. 12, Exhibit 6.) This document, it argues, does not summarize voluminous records, nor does it include all records related to Fulcher's foot. Therefore, the Government reasons that the Court should instead rely upon the actual medical records that the document purports to summarize.

Federal Rule of Evidence 1006 permits the introduction of summaries "to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Without having viewed the medical records at issue, the Court cannot yet comment upon its ability to examine them during and after the bench trial; however, Fulcher's proposed exhibits include approximately twenty medical records, listed as Exhibit Nos. 5-a through 5-u.

The Court has considered both objections and concludes that it need not exclude either document, particularly given that this matter will be resolved by bench trial rather than by a jury. Although the Court will permit the introduction of Fulcher's summaries, it will also look to the contents of the exhibits that purportedly support those summaries to determine their validity. The Court understands that the Government will emphasize any alleged discrepancies.

### III.   Collateral source issues

The parties next dispute the proper mechanism for determining Fulcher's alleged damages: while she relies upon the amounts assessed by her medical providers, the Government argues only the amounts actually paid by her insurance carrier should be collectible.

---

The Government also alleges that Fulcher has mischaracterized the medical record created on June 4, 2012. The medical record provides on this date: "FU – med [refill] – recheck feet – hurting at side where fell @ post office – check [with] Dr. De La Rosa on Metformin." (Docket No. 16-1, Record of June 4, 2012, Appointment.) In Fulcher's proposed timeline, however, she summarizes the visit as "[f]oot hurting at side where fell at Post Office." The Government contends that the chart does not indicate foot pain, and Ms. Hale explained that nothing about this summary indicates an ankle or foot problem associated with a fall. (*See* Docket No. 15-1, Hale Dep., at 40:1-7.) Fulcher has offered no direct response to this allegation.

Kentucky's long-held collateral source rule does not support the Government's conclusion. This rule precludes courts from reducing a plaintiff's medical damages based on insurance payments made for her care, so long as the associated premiums were paid by the plaintiff herself or a third party other than the tortfeasor. *O'Bryan v. Hedgespeth*, 892 S.W.2d 571, 576 (Ky. 1995). Because the rule applies to public benefits as well as other types of medical insurance, it encompasses the Blue Cross Medicaid Advantage policy that covered Fulcher's care subsequent to the alleged accident. *See Our Lady of Mercy Hosp. v. McIntosh*, 61 S.W.2d 377 (Ky. 1970).

As the Kentucky Supreme Court has noted, the fact that a public insurance program contracted with a physician to provide discounted care does not relive a tortfeasor from negligence or the duty to pay the *reasonable value* of the resultant medical expenses. *Baptist Healthcare Sys., Inc. v. Miller*, 177 S.W.3d 676, 683-84 (Ky. 2005). The Government's argument hinges upon this phrase: rather than accepting the billed amount as the reasonable value of services, the Government urges the Court to instead look to the negotiated rate to determine the reasonable value of Fulcher's medical care. It provides a transcript of Dr. Adams' testimony, wherein he admitted that the fees his office received for Fulcher's care were reasonable for the services rendered. (*See* Docket No. 24.)

The Court acknowledges the logic of this argument: the complexities of modern medical billing often result in phantom charges—a fee for services has been issued, but no party actually incurs the obligation to pay it; instead, the provider writes off the difference between the billed amount and the negotiated rate, or classifies it as an adjustment. This mechanism may indeed cloud the analysis of factfinders attempting to discern the actual reasonable value of medical services rendered. Faced with the often abstruse task of determining reasonable medical damages, the Commonwealth's highest court has expressed a distinct preference in favor of conscientious consumers by requiring tortfeasors to satisfy the full amount of their damages. The Kentucky Supreme Court provided a number of policy justifications for providing any associated windfall to the injured party rather than the tortfeasor.

> First, the wrongdoer should not receive a benefit by being relieved of payment for damages because the injured party had the foresight to obtain insurance. Second, as between the injured party and the tortfeasor, any so-called windfall by allowing a double recovery should accrue to the less culpable injured party rather than relieving the tortfeasor of full responsibility for his wrongdoing. Third, unless the tortfeasor is required to pay the full extent of the damages caused, the deterrent purposes of tort liability will be undermined.

*Baptist Healthcare Sys., Inc. v. Miller*, 177 S.W.3d 676, 683 (Ky. 2005) (quoting *Schwartz v. Hasty*, 175 S.W.3d 621, 626 (Ky. App. 2005)). The Court need not depart from the principles articulated in *Miller*. Therefore, the collateral source rule bars evidence of the amounts paid by Fulcher's insurance carrier at this stage.[5]

## Conclusion and Order

The Court having considered the parties' arguments and being otherwise sufficiently advised, both Fulcher's and the Government's objections are hereby OVERRULED. (Docket Nos. 14, 16.) As explained above, the Court concludes that the collateral source rule bars evidence of the amounts paid by Fulcher's insurance carrier and that Fulcher may seek only those damages initially submitted in her administrative claim.

IT IS SO ORDERED.

---

[5] Although the Government contends that Fulcher's claim for medical expenses must be offset by the expenses forgiven by healthcare providers, (Docket No. 19 at 3-4), Fulcher responds that no medical provider has forgiven a debt that she owed, (Docket No. 21 at 2-3). Should the Government contest this assertion, it may provide evidence to this effect at trial.