**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CIVIL ACTION NO. 5:13-CV-00163-TBR**

REGINA ANN FULCHER                                                        Plaintiff,

v.

UNITED STATES OF AMERICA                                               Defendant.

**MEMORANDUM OPINION AND ORDER**

On the damp afternoon of January 25, 2012, Plaintiff Regina Ann Fulcher traveled to the United States Post Office located at 225 West Broadway in Mayfield, Kentucky, ("the Post Office"), to check her mail.  When she entered through the wheelchair accessible door, she stepped onto a floor mat allegedly saturated with rain, causing her to slide, lose her balance, and fall forward onto the wet floor.  She struck a display shelf before ultimately landing on her right side.  Fulcher contends that as a result of this fall, she suffered serious and permanent injuries to her right side and right foot.

Fulcher brings this lawsuit against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*  She alleges that the Government, though employees of the United States Postal Service ("USPS"), failed to exercise ordinary care by neglecting to replace the wet floor mat with a dry one.  She also alleges that USPS employees negligently failed to comply with agency regulations requiring the use of signs to caution customers of a wet floor.  (Docket No. 1, ¶¶ 7-12.)

1

A bench trial was conducted before this Court on December 30, 2014 to resolve Fulcher's claims.  Having considered the testimony of various witnesses, the exhibits admitted into evidence on behalf of both parties, the arguments of counsel, and the remainder of the record, the Court finds as follows.

**Findings of Fact**

1. This case involves a slip and fall at the Mayfield, Kentucky Post Office operated by the United States Postal Service.  The accident from which this action arises occurred on January 25, 2012, throughout which it rained intermittently.

2. A rubber-bottomed, corrugated floor mat sits just inside the entrance from the wheelchair ramp to the Post Office lobby.  These floor mats were provided by a commercial rental company, which was contracted to replace them approximately twice weekly during the winter months.

3. The USPS Supervisor Safety Handbook requires supervisors to ensure that employees abide by certain procedures to prevent potential slip, trip, or fall accidents.  Specifically, postal employees should "secure carpets, rugs, and mats" and "[a]rrange them to prevent slipping.  Repair or replace those with wrinkles, turned up edges, or tears."  The manual provides further guidelines concerning wet floors, instructing employees to maintain a dry area for pedestrian traffic and requiring them to mop any excessive moisture on lobby floors.  Employees are further required to rope off wet areas with wet floor signs or high visibility safety barricades.  (Handbook EL-801, Plaintiff's Trial Exhibit 12.)

4. Additional safety instructions require USPS employees to "[i]nspect floor mats often.  If curling occurs . . . tape down the edges with pressure-sensitive or duct tape to prevent

tripping."  Employees are further advised to provide extra mats at customer entrances during inclement weather.  (Handbook MS-10, Plaintiff's Trial Exhibit 13.)

5.  At approximately three o'clock in the afternoon, Fulcher entered the Post Office from the wheelchair ramp entrance, where the floor mat was positioned.  She testified that the weather was "misting" at this point in the afternoon.  Upon Fulcher's first step onto the floor mat, she slipped and fell forward onto the wet floor, striking the display shelf before landing on her right side.  She described her fall as follows:  "I came up the wheelchair ramp.  I opened the door.  I stepped in.  The – I stepped in on the rug, slid.  I fell, landed on my right side, hit my shoulder up against the display shelf. . . . I hit the floor."  After the fall, Fulcher noticed that accumulated moisture had accumulated on both the floor mat and the floor itself and concluded that this accumulation caused her fall.  She then arose and walked to her post office box to retrieve her mail.

6.  No named witnesses observed the accident or complained of a wet floor. However, Stan Rogers, a postal employee, was stationed at the customer service desk at the time of Fulcher's fall.  As Rogers served customers, he heard a noise in the lobby and observed a woman stand up from the floor.  (Stan Rogers Statement, Plaintiff's Trial Exhibit 15.)

7.  No warning signs cautioned customers of the wet floor.

8.  Fulcher then left the Post Office and returned to the truck where her husband, Larry Wayne Fulcher, had been waiting for her.  Fulcher shared the story of her accident with her husband, who then entered the building and noticed that the floor mats and the surrounding surfaces were wet and observed footprints on the floor.  He testified that when he stepped on the floor mat, he "could see water on the inside sole of [his] shoe."   No customers, including Fulcher, complained that day of a wet floor or rain-saturated rug.  However,

Larry Fulcher spoke with a postal employee who advised him that the janitor was not working that day.   The Post Office's janitorial service was generally limited to approximately four hours each day, from eight o'clock in the morning until noon.

9.   The following day, Fulcher returned to the Post Office and reported her accident to USPS customer service supervisor Amanda Wallace, who was not typically assigned to the Mayfield branch but occasionally substituted there.   Fulcher executed a written statement reporting that she "[f]ell on the floor/hit left shoulder on shelf.  Right side hit floor.  Right shoulder and side hit floor.  The floor was wet.  Slid on carpet as well."  (Plaintiff's Trial Exhibit 2.)  Although she did not mention an injury to her right foot or ankle at this time, she now attributes this omission to the fact that she had not visited a doctor to determine whether she was hurt.

10.   Wallace recorded the circumstances that Fulcher conveyed to her as follows: "Aprox. 3 pm on 1-25—12 came in door w/ wheelchair ramp – had been raining – floor was wet – rug was there.  She states no sign said wet floor – shoes – diabetic shoes – black (I looked at her shoes.  Slipped on wet floor.  Rug slipped as soon as she walked on door – boom – went down – no one assisted – states Stan saw her fall."  (Plaintiff's Trial Exhibit 14.)

11.   Wallace prepared the required accident investigation worksheet and report for the USPS following her interview with Fulcher.   On the forms, Wallace indicated that the weather was rainy and that the surface condition was wet.   Wallace recorded Fulcher's complaints of shoulder pain; no mention was made of foot or ankle injury.   (USPS Accident Investigation Worksheet, Plaintiff's Trial Exhibit 10; USPS Form 1769/301 Accident Report, Plaintiff's Trial Exhibit 11.)

12. Fulcher testified that subsequent to the fall, her foot began to hurt.  Medical records indicate that Fulcher had previously complained of right foot pain in November 2010 and March 2011, when her internist, Dr. Patrick Finney, ordered x-rays of the foot.  (Medical Records of Dr. Finney, Defendant's Trial Exhibit 18.)

13. On January 27, 2012, Fulcher was seen at Dr. Finney's office, where she treated with Nurse Practitioner Amanda Hale.  The resultant medical records indicate that Fulcher reported having fallen two days prior and complained pain in both shoulders and down the right side of her body.[1]  Medical staff recorded no complaints of foot pain, edema, or other abnormalities in Fulcher's chart.  (*See* Docket No. 15-1, Deposition of Amanda Hale, Defendant's Exhibit 1.)  Hale ordered x-rays of Fulcher's ribs, chest, and shoulders, none of which indicated new injuries.  Hale testified that had Fulcher complained of foot pain on this date, she would have ordered x-rays on the foot as well.  (Docket No. 15-1, Deposition of Amanda Hale, at 26.)

14. On March 6, 2012, Fulcher was seen by pulmonologist Dr. Jeffrey S. Clarke for follow-up care regarding a previous lung surgery.  Although Fulcher reported her fall to Dr. Clarke, the medical record from this appointment reflects no mention of either the accident or any foot pain.  (Medical Records of Dr. Clarke, Defendant's Trial Exhibit 21.)

15. Fulcher again presented to Nurse Practitioner Hale on March 7, 2012, with complaints of side pain from her previous fall.  Hale also noted "questionable claudication" related to "[d]ark pigmented areas on bilateral ankles and feet."  (Docket No. 15-1, Deposition of Amanda Hale, Defendant's Exhibit 3.)   Dr. Finney ordered a bone scan of Fulcher's right

---

[1] In the Complaint section of Fulcher's chart from this visit, the chart reads:  "Fell Wed[nesday] in Post Office – hurting in shoulders – r[ight] side – hurts worse in l[eft] shoulder – need Xanax refill."  (Docket No. 15-1, Deposition of Amanda Hale, Defendant's Exhibit 1.)

foot.  (Docket No. 15-1, Deposition of Amanda Hale, Defendant's Exhibit 3.)  This record does not indicate that Fulcher complained of foot or ankle pain resulting from her accident.

16.  Fulcher underwent a three-phase bone imaging of the foot on April 13, 2012.  The resultant report of radiologist Dr. Frederic Park reflects the ordering diagnosis of right foot pain and swelling and notes a history of the same symptoms, although it references no specific event.  (Docket No. 15-1, Deposition of Amanda Hale, Plaintiff's Exhibit 1.)  Dr. Park reported that the bone scan tested positive for increased radiotracer activity in the right ankle and revealed possible degenerative arthritic changes.  (Plaintiff's  Trial Exhibit 5-E.)  Although Nurse Practitioner Hale testified that nothing in the report would indicate that Fulcher had a fractured foot in June 2012, Dr. William R. Adams testified that the increased radiotracer activity was associated with the fracture arguably caused by the January 2012 fall.  (Dr. Adams Deposition, Docket No. 25-3, at 44:20-45:18.)

17.  On June 4, 2012, Fulcher was treated by Nurse Practitioner Barbara Finney for continued complaints of side pain resulting from her fall.  Nurse Practitioner Finney noted a rash on Fulcher's right foot and right axilla, prescribed an anti-itching medication, and ordered a bone density study and arterial studies of Fulcher's right lower extremities.  The record does not indicate that Fulcher complained of an injury to her foot associated with a fall.

18.  On September 5, 2012, Fulcher reported continued pain and swelling in her right foot to Nurse Practitioner Finney, who ordered an x-ray of the ankle.  (Plaintiff's Trial Exhibit 5-I.)  The subsequent report indicated an "[i]ndeterminate age medial malleolus fracture" that "appear[ed] to be chronic though there is overlying soft tissue edema."  (Plaintiff's Trial Exhibit 5-J.)

19. Dr. Finney ultimately referred Fulcher to Dr. Adams of the Orthopaedic Institute of Western Kentucky.  On October 8, 2012, Dr. Adams ordered x-rays on her right ankle, tibia-fibula, and right foot.  He diagnosed a "nondisplaced medial malleolus fracture" and prescribed immobilization of Fulcher's right leg using a pneumatic walking boot that extended up to her kneecap.  (Plaintiff's Trial Exhibit 5-L.)  Dr. Adams conducted monthly follow-up examinations of Fulcher until February 8, 2013.

20. At a second visit with Dr. Adams on November 5, 2012, Fulcher complained of continued ankle pain.  X-rays continued to reflect a nondisplaced fracture with no significant increase in consolidation.  (Plaintiff's Trial Exhibit 5-M.)

21. Fulcher reported continued pain at her next visit, and x-rays indicated no significant healing of the fracture.  As a result, Dr. Adams ordered an MRI evaluation of Fulcher's right ankle on December 20, 2012.  (Plaintiff's Trial Exhibit 5-N.)

22. Dr. Harold Halfhill of the Orthopaedic Institute reported the results of the MRI, finding a nonunited fracture involving the medial malleolus with minimum displacement.  Dr. Halfhill reported that because the MRI reflected "[n]o associated marrow edema[,] suggesting this is at least several weeks to months in age." (Plaintiff's Trial Exhibit 5-O.)

23. During an office visit on January 11, 2013, Fulcher complained of continued pain in her right ankle and reported that the immobilization regimen had not improved her pain.  For the first time, Dr. Adams reviewed Fulcher's MRI with her and presented her with two treatment options:  either long-term ankle bracing or surgery to extract the fractured fragment and reattach her deltoid ligament.[2]  (*See* Plaintiff's Trial Exhibit 5-Q).

---

[2] In the Plan section of Dr. Adams' Progress Report regarding Fulcher's condition, he indicated:

> Discussed her condition and reviewed her MRI as well as plain film x-rays with her today.  I did discuss continued immobilization in her boot for another few weeks to see if

24. On February 8, 2013, Fulcher reported persistent pain, along with numbness and tingling in her toes.  Dr. Adams advised her to forego the walking boot and to begin physical therapy. (See Plaintiff's Trial Exhibit 5-R.)  However, Fulcher was financially unable to pay for physical therapy.  Instead, she returned to Dr. Finney, who prescribed Neurontin for severe foot pain on May 3, 2013.  (Plaintiff's Trial Exhibit 5-S.)

25. On December 4, 2013, Dr. Marissa Stewart-Jaynes of Mercy Primary Care-Paducah also recommended that Fulcher undergo physical therapy.   Fulcher began a physical therapy regimen on January 7, 2014, which lasted until March 5, 2014.  (Plaintiff's Trial Exhibit 5-U.)

26. Although Fulcher now reports improved strength, she alleges that her ankle pain persists.

27. Fulcher's medical records dating prior to her accident indicate a history of swelling and other issues with her right foot.  On a March 1, 2011, appointment at Dr. Finney's office, Fulcher complained of swelling in her right foot.  (Docket No. 15-1, Deposition of Amanda Hale, Defendant's Exhibit 4.)  Dr. Finney ordered an x-ray of the right foot. She underwent x-rays on two separate pre-fall occasions, the first on January 27, 2006, and the second on March 10, 2011.  Neither indicated a fracture of either her right ankle or her right foot. Nurse Practitioner Hale postulated that Fulcher's well-settled diagnoses of diabetes and osteoporosis rendered her vulnerable to such chronic foot injuries, even without a traumatic triggering event.  (Docket No. 15-1, Deposition of Amanda Hale, at 62, 73.)

---

we can get this to scar in and become asymptomatic.  We did discuss long term ankle bracing versus surgical excision of the fracture fragment with reattachment of the deltoid ligament.  Risk and benefits of this procedure were discussed.  Questions were answered. Postoperative course and complications were reviewed.  She will return to clinic in 3-4 weeks for followup and reevaluation.  We will get another x-ray of her ankle at that point.

(Plaintiff's Trial Exhibit 5-Q.)

28. On December 7, 2012, Fulcher timely submitted an administrative claim form SF95 to the USPS for $47,417.02, including $12,385.46 for medical expenses and $35,000.00 for personal injury. (Form SF95-109, Plaintiff's Trial Exhibit 3.) The USPS denied her claim on March 15, 2013. Fulcher then submitted a request for reconsideration on March 20, 2013, which was denied nine days later. The instant lawsuit was timely commenced on September 20, 2013.

29. Fulcher now seeks to recover sums exceeding the amount designated in her administrative claim. She alleges that additional medical needs caused her expense to increase from $12,385.46 to approximately $14,056.86—a difference of $1,671.40. Throughout Fulcher's treatment, her care was covered by a BlueCross Medicaid Advantage insurance policy, and its payments were generally accepted as payment in full. (See Plaintiff's Trial Exhibit 7, Itemized Medical Expenses.)

## Conclusions of Law

The Court must now determine whether Fulcher has proven her negligence case.

1. Claims against the United States are generally barred except for those tort claims for which Congress has waived sovereign immunity and granted consent for the United States to be sued. Therefore, Fulcher's exclusive remedy against the United States is pursuant to the Federal Tort Claims Act. *See* 28 U.S.C. § 2679.[3] Under the FTCA, Congress granted consent for the United States to be sued for acts committed by "any employee of the

---

[3] 28 U.S.C. § 2679(b)(1) provides, in pertinent part, as follows:

> The remedy against the United States as provided by sections 1346(b) and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee.

Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). The Government's liability under the FTCA is to be determined in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674. Pursuant to 28 U.S.C. § 2679(d)(1), the United States was properly substituted as the defendant for Fulcher's state law tort claims. This Court's jurisdiction arises from the jurisdictional grant in 28 U.S.C. §1346(b). Venue is proper according to 28 U.S.C. § 1402(b).

2. Pursuant to 28 U.S.C. § 1346(b)(1), the Court will determine liability "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Because Fulcher's injury occurred in Mayfield, Kentucky, Kentucky negligence law applies.

3. Fulcher claims that the USPS was negligent in its duty to maintain safe facilities. For Fulcher to prevail, she must prove (1) a duty of care owed by the defendant, (2) a breach of that duty; and (3) actual and proximate causation of an injury to the plaintiff. *Melton v. Montgomery*, 595 S.W.2d 257, 258 (Ky. App. 1980); *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1992).

4. Kentucky law does not render an establishment absolutely liable to invitees onto its premises; however, it must exercise ordinary care to prevent injuries. The USPS owes a duty to its patrons to maintain its premises in a reasonably safe condition. *Rogers v. Professional Golf Ass'n of America*, 28 S.W.3d 869 (Ky. App. 2000). Specifically, Kentucky law requires a property owner to exercise reasonable care to protect invitees from hazardous conditions that he was aware of or should have discovered and that the invitee could not be expected to discover. Under Kentucky law,

> a possessor of land is subject to liability for physical harm caused
> to his invitees by a condition on the land if, but only if, he: (a)

> knows or by the exercise of reasonable care would discover the condition, and should realize that it involves unreasonable risk of harm to such invitees; and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it; and (c) fails to exercise reasonable care to protect them against the danger.

*See Lanier v. Wal-Mart Stores, Inc.*, 99 S.W.3d 431, 432-33 (Ky. 2003) (quoting Restatement (Second) of Torts §343 (A.L.I. 1965)).

5. The Post Office, as a possessor of land, had an affirmative duty to maintain the entryway in a reasonably safe manner for its patrons. This duty required the Post Office to discover unreasonably dangerous conditions on its premises and either correct them or warn of them.[4] *See, e.g., Kentucky River Medical Ctr. v. McIntosh*, 319 S.W.3d 385, 388 (Ky. 2010). Fulcher encountered an unreasonable risk of harm that was fully foreseeable to the Post Office, which could have anticipated the risk of slick flooring. *See Dick's Sporting Goods*, 413 S.W.3d at 899 n.6. The Post Office failed to adequately observe the entryway to ensure that the floor mats adequately absorbed precipitation. Accordingly, the Post Office breached its duty to observe and remedy any dangerous conditions. See Lyle v. Mergele, 109 S.W.2d 598, 600-01 (Ky. 1937) ("A customer in a store may assume that the floor will be free from obstructions of a dangerous nature and from a slippery spot, although he may not walk blindly, irrespective of obvious danger.").

6. Admittedly, no medical evidence suggests that plaintiff suffered an actual fracture of the foot until September 12, 2012, eight months after her fall. Despite this delay, however, a

---

[4] This case does not present an open-and-obvious hazard, as the danger was neither known nor obvious to Fulcher. *See Dick's Sporting Goods, Inc. v. Webb*, 413 S.W.3d 891, 895 (Ky. 2013) Fulcher was unaware that the floor mat was saturated and did not realize the danger it posed. Moreover, the Court cannot say that a reasonable person would have recognized the floor mat's wet condition upon entering the Post Office. Rather, it appears that the floor mat's saturation was not easily appreciable without closer inspection beyond the exercise of reasonable care.

preponderance of the evidence suggests that the unsafe conditions at the Post Office were as substantial factor in causing both Fulcher's accident itself and the injuries she subsequently sustained.

7.  The Government objects to the admission of Dr. Adams' testimony, arguing that he could not provide legal causation.  Because the Court disagrees, it will admit Dr. Adams' testimony.  A plaintiff must prove medical causation by a reasonable medical probability by using expert medical testimony.  *Brown-Forman Corp. v. Upchurch*, 127 S.W.3d 615, 621 (Ky. 2004).  Nevertheless, a physician need not use particular "magic words" to signal that such reasonable medical probability exists.  *Id.*  Instead, the Court will look to the "quality and substance" of a physician's testimony to determine "whether it rises . . . to the level necessary to prove a particular medical fact."  *Id.* (citing *Turner v. Commonwealth*, 5 S.W.3d 119, 122-23 (Ky. 1999)).  Kentucky courts apply a "totality of the medical testimony" standard, wherein "terms such as 'distinct possibility' and 'high likelihood' [go] beyond speculation and [amount] to substantial evidence of causation."  *Baylis v. Lourdes Hospital, Inc.*, 805 S.W.2d 122, 125 (Ky. 1991) (citing *Stauffer Chemical Co. v. Greenwell*, 713 S.W.2d 825 (Ky. App. 1986)).

8.   Although Dr. Adams admitted that he had "no way to definitively prove" that the alleged fall caused Fulcher's ankle injury, Dr. Adams stated that such an outcome was "certainly possible," "certainly reasonable," and "consistent with her history."[5]  Relying upon this

---

[5] Specifically, Dr. Adams testified:

> Q:  Assuming that the history as given to you by Ms. Fulcher on the first office visit of her having fallen back in January of 2012, do you have an opinion as to whether the fall caused the fracture of the medial malleolus of the right ankle? That's based on reasonable medical probability as contrasted with certainty and as also contrasted with possibility.
>
> Mr. Ekman:  Objection to form.

testimony, the Court finds that the "total meaning" of Dr. Adams' opinion extends beyond that of mere possibility and thus sufficiently satisfies the causation requirement.

9.   The Government further argues that Fulcher failed to properly disclose Dr. Adams as a retained expert and did not submit an expert report pursuant to Federal Rule of Civil Procedure 26(a)(2).  To determine whether a plaintiff must disclose a treating physician as an expert, a court must consider the fundamental "scope of the proposed testimony." *Fielden v. CSX Transportation, Inc.*, 482 F.3d 866, 871 (6th Cir. 2007).  "[A] report is not required when a treating physician testifies within a permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment."  *Id.*  Here, no evidence indicates that Dr. Adams speculated beyond what he observed during his treatment of Fulcher, nor did he

---

Q:  That's all right.  If you can give us an opinion, you can go ahead and do that, sir.

A:  You know, it's certainly reasonable that she sustained this injury on that date during that event.  You know, again, I didn't' examine her after her initial date of injury, and she did have multiple other areas that were, I believe, injured or painful, as I reviewed her chart.  I believe she had some rib pain and things like that, as well.  So, you know, in reviewing her chart, you know, her ankle pain wasn't one of her main complaints initially with the person that she saw initially.  But, you know, when you have multiple areas of pain or multiple injuries, you know, sometimes you kind of go down that list, and if something is at the bottom of the list, you know, you might not mention it.  You know, if you have a cracked rib and it hurts every time you breathe, you might not be worried so much about your ankle at that point.  So, you know, I guess what 'm saying is in my opinion, it's reasonable that she could have sustained that injury on that date, you know, but I really don't have any – you know, other than my initial evaluation on 10/8, you know, unfortunately, I didn't examine her nearer to her original injury.

Q:  Understood.  And I think you answered the question very well, but let me just put it to you another way and see what your answer will be.  Do you have an opinion as to whether the fracture of Ms. Fulcher's right ankle is consistent with the testimony of her having sustained a fall back in January of 2012?

A:  It can be consistent with the history of a fall.

(Docket No. 23-2, Dr. Adams Deposition, at 15:22-17:17.)

form opinions outside the scope of his medical training.  Furthermore, any arguable breach of Rule 26(a) did not prejudice the Government, which was amply prepared to cross examine Dr. Adams regarding both medical causation and whether his deposition would constitute expert testimony.  *See* Federal Rule of Civil Procedure 37(c)(1) (allowing the admission of undisclosed expert testimony if "harmless" to the opposing party).

10. Finally, the Court considers whether Fulcher may seek damages exceeding the amount of her administrative claim in light of what she characterizes as newly discovered intervening facts.  The instant complaint alleges medical damages of $14,056.86, an increase of $1,671.40 beyond what she alleged on the administrative claim form.  Fulcher maintains that at the time she presented her claim to the USPS on December 10, 2012, she remained unaware of the additional medical expenses she would incur.  Namely, she contends she did not learn of her future treatment alternatives, including surgery and long-term ankle bracing, until January 11, 2013. Because she did not yet realize the full extent of her expenses when she filed the initial administrative claim, the Court will allow her to recover damages in excess of the original amount she sought.

11.  Fulcher's ability to seek damages beyond those named in her administrative claim hinges upon whether her subsequent care constitutes newly discovered evidence.  The Federal Tort Claims Act addresses this question, providing in relevant part:

> Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.

28 U.S.C. § 2675(b).  Fulcher must thus show intervening facts or newly discovered evidence.  *Allgeier v. United States*, 909 F.2d 869, 877 (6th Cir. 1990) (citing *Kielwien v. United States*, 540 F.2d 676, 680 (4th Cir. 1976)).  In order to satisfy this burden, she must demonstrate that she was not reasonably capable of discovering the new evidence or intervening fact at the time the administrative claim was filed.  "The plaintiff is required to demonstrate that the new information could not have been discovered through the exercise of reasonable diligence."  *Simpson v. United States*, 2014 WL 3943610, at *3 (quoting *Norrell v. United States*, 2002 WL 32060141, at *3 (E.D. Tenn. Aug. 1, 2002)).

12. *Allgeier* sets forth the Sixth Circuit's exacting standard of what constitutes an "intervening fact."  Similar to Fulcher's own position, *Allgeier* involved a plaintiff's administrative claim filed pursuant to the Federal Tort Claims Act.  When the district court permitted the plaintiff to increase the amount of her claim, the Government moved to reduce the award to the sum specified in her administrative complaint.  The district court denied the Government's motion, concluding that the plaintiff did not know the full extent of her injuries and medical expenses at the time that she filed the administrative claim.  Although the Sixth Circuit ultimately upheld the district court's determination in *Allgeier*, it emphasized that the medical condition at issue improved immediately before she filed her claim—but contrary to her physician's prognosis, the plaintiff's condition worsened significantly over a year after the claim had been filed.  This unforeseen and unexpected turn for the worse constituted an "intervening fact," thus satisfying the narrow category of circumstances that do not offend the statute's requirements.

13. Here, Fulcher's initial claim sufficiently advised the USPS that she experienced an ankle fracture resulting in swelling and continual pain that required further treatment.  The Court

agrees that the information gained from the MRI constitutes newly discovered evidence:  at the time she filed the claim, Fulcher had been diagnosed with only a nondisplaced fracture and had not yet undergone the MRI that would reveal her minimal displacement.  (*See* Docket No. 19-1, Record of Dr. Adams, October 8, 2012; Docket No. 21-3, Report of Dr. Harold L. Halfhill, December 20, 2012.)  At this stage, Dr. Adams had not mentioned the possibilities of surgery, long-term bracing, or physical therapy; only upon reviewing the MRI on January 11, 2013, were such options discussed.  (Docket No. 21-4, Report of Dr. Adams, January 11, 2013.)  At this time, Fulcher had no reason to doubt the conservative course of treatment that Dr. Adams initially prescribed and that more aggressive treatment was not reasonably foreseeable.[6]   Certainly, a majority of individuals tasked with

---

[6] Dr. Adams knew that more drastic treatments were within the scope of possibilities for Fulcher's care.  Dr. Adams' testimony indicates that although the preferred treatment began with a conservative approach, both long-term bracing and surgery remained possibilities.

Q.  So when she came in the first time, did you know what your options were with regard to treatment?

A.  Yes.

Q.  And did you know that bracing was a potential option for her at that time?

A.  Well, initially, we wanted to try immobilization prior to bracing because we wanted to try to get her to improve and not to become asymptomatic.  So once that failed, then, you know, that's when you go on to the next level discussing like long-term bracing or surgical intervention.

Q.  Right.  And so the first attempt is always to treat this type of an injury with an immobilizer and some sort of conservative fashion?

A.  Exactly.

Q.  And so you wait and you tell the patient, "Use your immobilizer, try to stay off of your leg, let's see if we can get healing in your foot without any need for surgery or bracing."

A.  Correct.  Absolutely.

Q.  But at the time, you know that if healing doesn't take place, immobilizing of that ankle is not successful, that the next option will be bracing or surgery; is that correct?

anticipating their prognosis after such an accident would, like Fulcher, take our physician's advice at face value.   Dr. Adams' acknowledgement of Fulcher's long-term treatment options thus constitutes "newly discovered evidence."

14.   What is more, the claim form itself arguably misled Fulcher by suggesting that she should submit only the "*known* facts and circumstances attending the . . . injury."   (*See* USPS Standard Form 95, Plaintiff's Trial Exhibit 3.)   This language impliedly instructed Fulcher to limit her claims to only the injuries and requisite treatment that had been established at the time of its submission.   Moreover, the form warns of potential criminal penalties associated with making false statements to a federal agency, reiterating the definite standard apparently demanded by the USPS.   (*See* USPS Standard Form 95, Plaintiff's Trial Exhibit 3 (warning that a $10,000 fine and five years of imprisonment could result from presenting a fraudulent claim).)   Fulcher could reasonably have assumed that any amounts exceeding those she had already incurred would have been improper—even potentially illegal.

---

A.   Correct.

Q.   And you knew that because you've treated these types of injuries before, correct?

A.   Right.

Q.   So you knew that the first item you saw her, first step, attempted immobilization, if that doesn't work, we go to surgery or bracing, correct?

A.   Sure.  Yes.

Q.   I mean, those treatment options were known to you in October of 2012 when you first saw her?

A.   I would say that that is a well-accepted standard treatment, algorithm for this problem.

(Docket No. 24-1 at 46-48.)  Fulcher, however, had no knowledge that this course of treatment was in store.

15. Fulcher noted in her administrative claim that additional tests were forthcoming. In the administrative claim she submitted to the USPS in December 2012, she indicated the following as the basis of her claim:

> I stepped in post office door, I stepped on the floor mat which was [saturated] with rain water and slipped down causing me to fall down on my right side.  There were no wet floor warning signs no where in the post office.  Non ending pain plus a fracture on the ankle on top of foot plus swelling.
>
> . . .
>
> P.S.  They are going to do some more x-rays on me[.]

(*See* Docket No. 19-1.)   This annotation afforded the Government with some notice, however vague, that costs beyond those listed could accrue.

16. In light of the above analysis, the Court concludes that Fulcher's additional treatment constitutes newly discovered evidence or an intervening fact and that she may therefore recover sums exceeding those indicated in her administrative claim.

17. Kentucky's collateral source rule permits Fulcher to recover those amounts charged by her medical providers without reduction by payments made on her behalf by her insurance carrier.   As the Kentucky Supreme Court has noted, the fact that a public insurance program contracted with a physician to provide discounted care does not relieve a tortfeasor from negligence or the duty to pay the reasonable value of the resultant medical expenses.   Instead, the plaintiff may seek recovery for the reasonable value of medical services without consideration of insurance (or Medicare) payments. *Baptist Healthcare Sys., Inc. v. Miller*, 177 S.W.3d 676, 683-84 (Ky. 2005).

18. The Court will award Fulcher money damages that fairly and reasonably compensate her for the injuries that resulted from her fall, including the $14,186.86 in total medical bills

that she has reported.   (Plaintiff's Trial Exhibit 7, itemizing Fulcher's medical expenses.) Moreover, the Court concludes that Fulcher is entitled to an award for past and/or future pain and suffering in the amount of $15,000.

cc:  Counsel of Record
    Craig Houseman